Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 10, 2004        Decided June 25, 2004

No. 03-1020

INDEPENDENT EQUIPMENT DEALERS ASSOCIATION,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

ENGINE MANUFACTURERS ASSOCIATION,
INTERVENOR

On Petition for Review of an Order of the
Environmental Protection Agency

*William R. Weissman* argued the cause for petitioner. On the briefs were *LeAnn M. Johnson–Koch* and *James P. Rathvon*.

*Laurel A. Bedig*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief was

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Michael J. Horowitz*, Attorney, U.S. Environmental Protection Agency.

*Jed R. Mandel* and *Timothy A. French* were on the brief for intervenor.

Before: ROGERS, GARLAND, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: Petitioner Independent Equipment Dealers Association (IEDA) is a trade association of independent dealers of heavy construction and industrial equipment, such as cranes, large forklifts, and generators. IEDA dealers are "independent" in the sense that they are not affiliated with any manufacturer. In December 2002, IEDA wrote to EPA seeking EPA's concurrence in its interpretation of emissions regulations pertaining to "nonroad engines" — engines used in such heavy construction and industrial equipment. *See generally* 40 C.F.R. pt. 89. Four weeks later, EPA replied that it did not concur in IEDA's proffered interpretation. IEDA then filed this petition for review claiming that EPA, by its letter, had substantively amended its regulations concerning nonroad engines, and in so doing had failed to comply with the notice-and-comment requirements of Section 307(d) of the Clean Air Act, 42 U.S.C. § 7607(d)(3). IEDA alternatively contends that EPA's letter violated the Clean Air Act's prohibition on agency action that is arbitrary or capricious. *See id.* § 7607(d)(9)(A). We conclude that we lack jurisdiction and accordingly dismiss the petition for review.

I.

Since 1996, EPA has regulated nonroad engines by requiring their manufacturers to obtain a "certificate of conformity" indicating compliance with EPA emissions standards before selling such engines or importing them into the United States. 40 C.F.R. §§ 89.105, 89.1003(a)(1); *see also* 42 U.S.C. § 7547(a) (authorizing regulation of nonroad engines); *id.* § 7522(a)(1) (prohibiting the sale, distribution, or importation of any uncertified new motor vehicle engine). Manufacturers

are not required to obtain certificates of conformity for each individual engine or engine model, but rather for each "engine family." 40 C.F.R. § 89.105. EPA defines an engine family as a group of engines "expected to have similar emission characteristics throughout their useful life periods" — a categorization based on the design and emissions characteristics of the engines. *Id.* § 89.116. The application for the certificate of conformity must include "[a]n unconditional statement certifying that all engines in the engine family comply with all requirements of this part [40 C.F.R. pt. 89] and the Clean Air Act." *Id.* § 89.115(d)(10). Those requirements include not only the emissions specifications, but also recall liability, *see id.* § 89.701 *et seq.*, emissions defect reporting requirements, *see id.* § 89.801 *et seq.*, and warranty obligations, *see id.* § 89.1007. Manufacturers are also subject to "selective enforcement auditing" — emissions testing at the assembly line or, for engines manufactured abroad, at the point of importation. *See id.* § 89.503.

In furtherance of this regulatory regime, EPA also requires manufacturers to affix to each new engine an "emission control information label" that identifies the engine and states that it conforms to all EPA emissions standards and regulations. *Id.* § 89.110, (b)(10); *see also id.* § 89.1003(a)(4)(ii) (prohibiting sale or delivery of engine without emission control label affixed). On a practical level, this engine label demonstrates to dealers, purchasers, and enforcement inspectors that the engine is covered by an EPA certificate of conformity. Unlabeled engines are presumed to be uncertified. *See* Office of Regulatory Enforcement, U.S. Envtl. Prot. Agency, Enforcement Alert: EPA Steps Up Enforcement of Diesel, Gasoline Nonroad Engine Imports (Vol. 3, No. 2, Feb. 2000) (Enforcement Alert).

Many nonroad engines are manufactured outside the United States. Engines covered by a certificate of conformity may be imported into the United States subject only to ordinary customs regulations. Engines not covered by a manufacturer's certificate of conformity may only be imported if they comply with EPA's Independent Commercial Importers (ICI) program. 40 C.F.R. § 89.601 *et seq.* The chief

burden associated with the ICI program is that after the importer has obtained a certificate of conformity for the engine family, the importer still must test one of every three imported engines for compliance with Part 89 emissions regulations. According to EPA, each test costs between $15,000 and $30,000, depending on the engine. EPA Br. 9. Additionally, since it is the importer, not the manufacturer, who obtains a certificate of conformity for the engines, all other Part 89 requirements — labeling, recall and warranty, etc. — run to the importer rather than the manufacturer. *See* 40 C.F.R. § 89.610. The ICI importer thus steps into the shoes of the manufacturer, assuming all the obligations that would ordinarily fall upon the manufacturer.

The market for nonroad engines in the United States is segmented between original engine manufacturers (OEMs), who sell the equipment they manufacture through networks of authorized dealers, and independent equipment dealers, who are not affiliated with an OEM. Independent dealers make their way in the market by re-selling equipment, frequently at lower prices than the OEMs. The collapse of the Asia–Pacific Rim economy in the late 1990s offered a unique opportunity to enterprising independent equipment dealers. In the deeply distressed Asian construction market, equipment distributors found themselves with bloated inventories and few prospects of selling that equipment locally. Sensing an arbitrage opportunity, some U.S. independent dealers bought equipment at depressed prices in Asia, and then imported the equipment into the United States. Of course, the Asian equipment could be legally imported only if it were covered by a manufacturer's certificate of conformity or had been taken through the costly and time-consuming ICI process. Few independent dealers availed themselves of the ICI program; the lack of significant EPA enforcement of Part 89 regulations made importation of uncertified equipment a much more lucrative path.

The importation of low-priced Asian equipment — EPA-certified and otherwise — by independent dealers into the United States market had the predictable effect of undermining the pricing power of the OEMs in the United States.

OEMs have a difficult time selling a machine for $50,000 when an independent dealer is selling the identical machine for $35,000, having purchased it in Korea for $20,000.

The OEMs appealed to EPA for increased enforcement of Part 89 regulatory requirements. In November 1998, EPA and the Associated Equipment Distributors, a trade association of authorized dealers, hosted a workshop to explain the Part 89 requirements as they pertained to imported engines. At the workshop, EPA vowed to enforce the regulations, and the Customs Service explained that it would impound any engine lacking an EPA emissions control information label. *See* Christian A. Klein, *GRAY MARKET CRACKDOWN: EPA & CUSTOMS LAY DOWN THE LAW*, CONSTR. EQUIP. DISTRIBUTION, Jan. 1999.

EPA followed up in February 2000 with an Enforcement Alert announcing its intention to increase enforcement of certificate of conformity and emission control information label requirements with regard to imported nonroad engines. *See* Enforcement Alert. In that document, EPA emphasized that all engines imported into the U.S. must be covered by a certificate of conformity and must bear an EPA-compliant emissions control information label. *Id.* at 1. In a "Fact and Fiction" segment, EPA also cautioned that many engines obtained overseas were not eligible for importation:

> *Fiction: An uncertified engine having similar or even identical emission characteristics as a certified engine should be able to be imported.*
>
> Fact: Manufacturers may produce engines that are identical to U.S. certified versions but the engines are not intended for the U.S. market. These engines are not certified and may not be imported unless they are produced under an EPA-issued certificate, [and] are properly labeled . . . .

*Id.* at 3.

EPA soon reiterated this position in response to an inquiry from authorized dealers. OEMs asked whether manufacturers could adopt a program of destination-specific labeling of

engines, thereby indicating which engines are and which are not covered by a certificate of conformity. EPA responded that "[t]he manufacturer is not only allowed to place a destination-specific label on a non-certified engine intended for sale elsewhere than the United States, but also is encouraged to do this." *See* Letter from Robert M. Doyle, EPA Attorney–Advisor, Certification and Compliance Division, Office of Transportation and Air Quality, to Julie R. Domike, Esq. 1 (Nov. 21, 2000). EPA explained that

> the key distinction for imported engines . . . is whether the manufacturer intended the engine to be covered by a certificate or not to be covered by a certificate. . . .
>
> In your scenario, the manufacturer has chosen, for whatever reason, to not include under certificate coverage the engines intended for sale elsewhere than the U.S., and so it will not place the EPA required emission label on the engines. This step is correct.

*Id.* at 2.

EPA was even more explicit in its 2001 response to an inquiry from an engine manufacturer. There EPA wrote, "[m]anufacturers also may choose . . . to produce engines which will not be covered by an EPA certificate, because they will be sold elsewhere than the U.S.," even though "[t]hese non-certified engines may be physically identical to engines which the manufacturer chooses to be covered by an EPA certificate." Letter from John Guy, EPA Manager, Engine Programs Group, Certification and Compliance Division, to Jonathan S. Martel, Esq. 1 (July 6, 2001).

The OEMs then — with EPA's blessing — took the position that only those engines they intended to import into the United States were covered by EPA certificates of conformity, and began affixing EPA emissions control labels only to those engines. This had the desired effect; independent dealers seeking access to the United States market were left only with the much less attractive option of importing uncertified machines through the ICI process, even though many of

those engines — according to IEDA — were identical in all respects to engines to which OEMs had affixed labels.

IEDA believes this destination-specific labeling program violates EPA's Part 89 regulations. IEDA wrote to EPA to raise the question of whether "engines that are 'identical' to an EPA certified version can be designated 'uncertified' by the engine manufacturer under the regulations at 40 C.F.R. Part 89." Letter of LeAnn M. Johnson–Koch to Christine Todd–Whitman, EPA Administrator 1 (Dec. 23, 2002) (IEDA Letter). IEDA stated its view that because certificates of conformity apply to "engine families and not to individual engines," and because "the engine family is defined by its physical characteristics," "all engines that have the same physical characteristics…are covered by the certificate of conformity issued to the engine family." *Id.* IEDA sought EPA's concurrence in this conclusion and also IEDA's view that all manufacturers' Part 89 obligations, including warranty, recall, and defect reporting requirements, and, crucially, the emissions control information label requirement, apply to all such covered engines. *Id.* at 2.

EPA responded that it did not concur in IEDA's interpretation of the Part 89 regulations. *See* Letter from Margo Tsirigotis Oge, EPA Director, Office of Transportation and Air Quality, to LeAnn M. Johnson–Koch, Esq. 1 (Jan. 21, 2003) (EPA Letter). EPA stated that "[n]either the Clean Air Act [n]or our regulations impose [Part 89] requirements on engines that the manufacturer did not introduce or intend for introduction into U.S. commerce." *Id.* It explained that the "requirement to divide a 'manufacturer's product line' into engine families in 40 CFR 89.116 refers to that portion of the product line intended for sale in the U.S." *Id.* at 2. Thus, contrary to IEDA's interpretation, a manufacturer was empowered to "identify which of its engines are covered by its certificate of conformity and which are not." *Id.* This identification was typically accomplished, said EPA, through the

affixing (or not) of the emissions control information label. *Id.*

Unsatisfied with that response, IEDA filed the instant petition for review.

## II.

IEDA contends that the EPA Letter adds a manufacturer "intent" element to the definition of an "engine family," and thus substantively amends the Part 89 regulations — specifically 40 C.F.R. § 89.116 — without satisfying the notice-and-comment requirements of the Clean Air Act. *See* 42 U.S.C. § 7607(d)(3). Alternatively, IEDA claims that the EPA Letter violates the Act's prohibition on regulation that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 7607(d)(9)(A).

We recently confronted a factually similar case in *General Motors Corp. v. EPA*, 363 F.3d 442 (D.C. Cir. 2004). There, General Motors petitioned for review of a letter from an EPA enforcement official containing a regulatory interpretation that certain automobile manufacturing solvents were "solid waste" under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.* General Motors sought review under RCRA's judicial review provision, 42 U.S.C. § 6976(a), alleging the agency letter unlawfully promulgated a final regulation without satisfying the notice-and-comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553. We found that the letter in question "reflect[ed] neither a new interpretation nor a new policy," but rather reiterated an interpretation that had been stated as early as 1997, and repeated without change on several occasions since. *General Motors*, 363 F.3d at 449. We thus concluded that EPA's letter did not amount to a final regulation. As our jurisdiction under RCRA is limited to the review of "final regulations, requirements, and denials of petitions to promulgate, amend or repeal a regulation," *id.* at 448 (quoting *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)) (internal quotation marks omitted); *see also* 42 U.S.C.

§ 6976(a), we dismissed General Motors' petition for lack of jurisdiction.

This holding would seem to raise a serious impediment to IEDA's substantive claims for relief. Here, we are presented with a virtually identical notice-and-comment challenge to an EPA letter, this time under the Clean Air Act. *See* 42 U.S.C. § 7607(d)(3). The notice-and-comment obligations under that Act apply, however, only if the EPA Letter constitutes a "promulgation or revision of any regulation pertaining to nonroad engines," *id.* § 7607(d)(1)(R). *See, e.g., American Forest & Paper Ass'n v. EPA*, 294 F.3d 113, 116 n.3 (D.C. Cir. 2002); *Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 812 (9th Cir. 1980) ("Section 7607(d) meticulously enumerates a list of actions to which its substantive provisions apply and expressly abrogates the review provisions of the APA only with respect to those actions."). As demonstrated above, the so-called intent requirement reflected in EPA's letter to IEDA is hardly new. EPA had publicly announced its interpretation of the certificate of conformity requirement no later than February 2000, when it labeled as "*Fiction*" the position IEDA presses before us now — that "*[a]n uncertified engine having similar or even identical emission characteristics as a certified engine should be able to be imported.*" Enforcement Alert at 3. The "Fact," according to EPA, was that "[m]anufacturers may produce engines that are identical to U.S. certified versions but the engines are not intended for the U.S. market. These engines are not certified . . . ." *Id.* Nearly three years later, EPA's letter to IEDA stated only that "[a] manufacturer . . . can properly identify which of its engines are covered by its certificate of conformity and which are not." EPA Letter at 2. The EPA Letter thus reflects no change in the position announced in the Enforcement Alert.

Just as in *General Motors*, because the January 2003 EPA Letter does not reflect any change in EPA's Part 89 regulations or its interpretation of those regulations, it is difficult to see how that letter "promulgat[ed] or revis[ed] . . . any regulation pertaining to nonroad engines." 42 U.S.C. § 7607(d)(1)(R); *see also Natural Res. Def. Council v. EPA*, 902 F.2d 962, 982 (D.C. Cir. 1990) (separate opinion of Wald,

J.) ("The word 'promulgate' in the CAA refers only to the original issuance of a standard, while the word 'revision' refers to subsequent modifications of that standard."), *vacated on other grounds*, 921 F.2d 326 (D.C. Cir. 1991). Unlike the situation in *General Motors*, though, this conclusion would go to the *merits* of IEDA's claims for relief; it would not be dispositive of our *jurisdiction*. In contrast to RCRA — where jurisdiction is limited to "final *regulations*," 42 U.S.C. § 6976(a) (emphasis added) — we have jurisdiction under the Clean Air Act to review "any . . . nationally applicable regulations promulgated, or final *action* taken, by the Administrator." *Id.* § 7607(b) (emphasis added).

Both EPA and Intervenor–Respondent Engine Manufacturers Association have raised numerous challenges to our jurisdiction over IEDA's petition for review, among them that the EPA Letter does not constitute "final action" within the meaning of the judicial review provision of the Act, *id.* § 7607(b). *See* EPA Br. 16–26; EMA Br. 8–10. As we are a court of limited jurisdiction, we are obliged to consider these jurisdictional objections before addressing the merits of IEDA's substantive claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–102 (1998).

At the outset, we observe that EPA's claim that its letter does not constitute "final action" seems somewhat inartful in view of its concurrent insistence that the interpretation of the certificate of conformity regulations contained therein *is* final and not subject to change. *See* Recording of Oral Arg. of Laurel A. Bedig, Counsel for EPA, at 15:22 (Question: "You're not ever going to change your view about this, at least in the near term. Right? This is your view. This is your view of what the regulation has always been — what it was at the time of the Alert, and what it was at the time of the Letter? Right?" Answer: "Correct." Question: "So the agency's view is not in process here?" Answer: "Absolutely not."); *id.* at 17:55 (Question: "This is not going to change. The view is not going to change. It's not tentative. You say that it's not the culmination of an agency process but that's

just because that process culminated long ago." Answer: "That's right.").

This line of argument becomes more understandable when one considers the dual requirements for "final agency action": (1) that the action be final — *i.e.*, not tentative or interlocutory; and (2) that the action be one from which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation omitted). The Government's brief makes clear that its underlying objection is not so much to the first element — concerning finality — as it is to the second — concerning the types of agency action suitable for review. EPA's brief does not assert that its interpretation is tentative or interlocutory; it does, however, forcefully argue that the EPA Letter is legally insignificant. *See*, *e.g.*, EPA Br. 18 (EPA Letter "do[es] not relate to a specific enforcement action or case pending before the Agency, do[es] not contain *any* mandatory language or directives, and do[es] not describe [itself] as guidance or announce that [it] contain[s] new interpretations of the regulations"); *id.* at 21 ("[T]he EPA Letter lacks any indicia of a reviewable agency action. The letter does not purport to impose new obligations on IEDA . . . . No legal consequences flow from it, and it inflicts no injury on IEDA or its members."). So rather than ask — awkwardly — whether an interpretation the parties agree is not subject to change is *final*, we instead frame our inquiry as whether the EPA Letter setting out that interpretation constitutes reviewable agency action.

In answering that question, we start with the acknowledgment that the term "agency action" undoubtedly has a broad sweep. *See*, *e.g.*, *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 238 n.7 (1980); *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001). But we also have long recognized that the term is not so all-encompassing as to authorize us to exercise "judicial review [over] everything done by an administrative agency." *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948). Here, common sense, basic precepts of administrative law, and the Adminis-

trative Procedure Act itself all point to the conclusion that the EPA Letter to IEDA is not reviewable agency action.

The answer seems obvious once we examine the concrete impact the EPA Letter had on IEDA and its members — in short, none whatsoever. As discussed above, the EPA Letter merely restated in an abstract setting — for the umteenth time — EPA's longstanding interpretation of the Part 89 certificate of conformity regulations. The Letter neither announced a new interpretation of the regulations nor effected a change in the regulations themselves. The Letter was purely informational in nature; it imposed no obligations and denied no relief. Compelling no one to do anything, the letter had no binding effect whatsoever — not on the agency and not on the regulated community. It was, as EPA describes it, "the type of workaday advice letter that agencies prepare countless times per year in dealing with the regulated community." EPA Br. 18. At oral argument, counsel for IEDA appeared to concede that such a letter, unless it wrought a regulatory change, would be an insufficient basis for jurisdiction. *See* Recording of Oral Arg. of William R. Weissman, Counsel for IEDA, at 13:45 (Question: "And ... if we thought that there was no change in the rule?" Answer: "Well, if there was no change, then presumably we should have appealed in '94. I don't quarrel with that.").

That concession is in accordance with our prior decisions. We have held that we lacked authority to review claims where "an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party." *AT&T v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001); *see also DRG Funding Corp. v. HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (holding unreviewable an agency order that "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" (internal quotation omitted)). Similarly, we have held often enough that when an "agency has not yet made any determination or issued any order imposing any obligation..., deny-

ing any right . . . , or fixing any legal relationship," the agency action was not reviewable. *Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 732 (D.C. Cir. 2003) (citing *Role Models Am., Inc. v. White*, 317 F.3d 327, 331–32 (D.C. Cir. 2003)); *see also id.* (agency action not reviewable when "[n]o legal consequences flow from the agency's conduct" and "there has been no order compelling [the regulated entity] to do anything"). "[P]ractical consequences," such as the threat of "having to defend itself in an administrative hearing should the agency actually decide to pursue enforcement," are insufficient to bring an agency's conduct under our purview. *Id.*

Moreover, our "reopening doctrine" specifically spells out the circumstances when an agency's discussion of its existing regulations *can* ripen into an "opportunity for renewed comment and objection" to those regulations. *Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C. Cir. 1988). Implicit in the very concept of a reopening doctrine is the notion that regulations and interpretations that have not been reopened by agency action remain at repose and are not newly reviewable. This, of course, makes good sense. Just as it would be folly to allow parties to challenge a regulation anew each year upon the annual re-publication of the Code of Federal Regulations, so too it is silly to permit parties to challenge an established regulatory interpretation each time it is repeated. Such a regime would quickly muzzle any informal communications between agencies and their regulated communities — communications that are vital to the smooth operation of both government and business.

Finally, the conclusion that the EPA Letter is not reviewable agency action draws support from the text of the Administrative Procedure Act. While this case is brought only under the Clean Air Act — IEDA raised no alternative APA arguments in its petition for review — the term "final action" is synonymous with the term "final agency action" as used in Section 704 of the APA. *See American Trucking Assn's*, 531 U.S. at 478. Under the APA, "agency action" is a defined term, limited to an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Of all these types of agency action, IEDA

has alleged only that the EPA Letter constitutes a "rule." *See* Pet. Br. 19–20 (arguing EPA Letter revised the Part 89 regulations pertaining to nonroad engines by promulgating an "Intent Rule"). Leaving nothing to chance, the APA also defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4). Although the EPA Letter is certainly a statement of "general or particular applicability" — what isn't? — and is arguably of "future effect" insofar as it may inform the future conduct of IEDA's members, the EPA Letter certainly does not "implement, interpret, or prescribe law or policy." By *restating* EPA's established interpretation of the certificate of conformity regulation, the EPA Letter tread no new ground. It left the world just as it found it, and thus cannot be fairly described as implementing, interpreting, or prescribing law or policy. *Cf. Industrial Safety Equip. Ass'n v. EPA*, 837 F.2d 1115, 1120–21 (D.C. Cir. 1988) (agency statements that did not "change any law or official policy presently in effect" did not constitute a "rule" under the APA).

Our conclusion that the EPA Letter is not reviewable agency action means that we lack jurisdiction to consider the merits of IEDA's substantive claims under the Act. *See* 42 U.S.C. § 7607(b). This conclusion obviates the necessity of considering the Government's and the Intervenor's other jurisdictional arguments. *See Fourth Branch Assocs. (Mechanicville) v. FERC*, 253 F.3d 741, 745 (D.C. Cir. 2001) ("we have no trouble dismissing a claim based on one jurisdictional bar rather than another") (internal quotation omitted).

The petition for review is dismissed for lack of jurisdiction.