599 F.Supp.2d 702 (2009)
GOLDEN AND ZIMMERMAN, L.L.C., and Robert W. Privott d/b/a Outer Bank Ammunition, Plaintiffs,
v.
Edgar A. DOMENECH, Special Agent in Charge, Washington Field Division, Bureau of Alcohol, Tobacco, Firearms and Explosives, Defendant.
Civil Action No. 2:08cv468.
United States District Court, E.D. Virginia, Norfolk Division.
February 27, 2009.
*705 Richard E. Gardiner, Esquire, Fairfax, VA, for Plaintiffs.
Kent Pendleton Porter, Assistant United States Attorney, Norfolk, VA, for Defendants.

OPINION AND FINAL ORDER
REBECCA BEACH SMITH, District Judge.
This matter comes before the court on defendant's motion to dismiss, or in the alternative, for summary judgment, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 56. For the reasons stated below, the court GRANTS the motion.

I. Background
Plaintiff, Golden & Zimmerman, L.L.C. ("G & Z"), holds a federal firearms license authorizing it to conduct business as a dealer in firearms from its business premises in Virginia. Plaintiff, Robert W. Privott ("Privott"), holds a license authorizing him to deal firearms from his business premises in North Carolina. Both plaintiffs attend gun shows in the Eastern District of Virginia. Plaintiffs challenge a "Frequently Asked Question" published by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), regarding certain provisions of the Gun Control Act of 1968 (the "GCA")[1] as they relate to the activities of federal firearms licensees at gun shows. Specifically at issue is "Frequently Asked Question F13" ("FAQ F13") featured in the Federal Firearms Regulations Reference Guide, an ATF publication.[2] FAQ F13 provides, in pertinent part:
(F13) What may a licensed dealer do at an out-of-State gun show? ... [A] licensed dealer may only display and take orders for firearms at an out-of-State gun show. In filling any orders for firearms, the dealer must return the firearms to his or her licensed premises and deliver them from that location. Any firearm ordered by a nonlicensee must be delivered or shipped from the licensee's premises to a licensee in the purchaser's State of residence, and the purchaser must obtain the firearm from the licensee located in the purchaser's State. Except for the sales of curio or relic firearms to other licensees, sales of firearms and simultaneous deliveries at the gun show, whether to other licensees or to nonlicensees, violate the law because the dealer would be unlawfully engaging in business at an unlicensed location.
FAQ F13 (citing 18 U.S.C. §§ 922(a)(1) and (b)(3), 923(a) and (j)). Plaintiffs claim that, as a result of FAQ F13, they "have refrained from doing what they have the right to do" under the relevant provisions of the GCA. They seek declaratory relief pursuant to the Declaratory Judgment *706 Act, 28 U.S.C. § 2201(a). (Compl. ¶ 18.) At the core of plaintiffs' claim is their belief that FAQ F13 represents "ATF's position" on the activities of licensees at out-of-state gun shows, and that this position is contrary to the GCA. (Id.)

A. The Gun Control Act

The GCA controls the sale and distribution of firearms through a comprehensive regulatory scheme. The GCA requires a person desiring to engage in the firearms business to, among other things, apply for and receive a federal firearms license from the Attorney General for each location at which the applicant expects to conduct business. See 18 U.S.C. § 923(a); 27 C.F.R. §§ 478.41(b), 478.50. Such license "covers the class of business or the activity specified in the license at the address specified therein." 27 C.F.R. § 478.50.[3] The license, as well as all pertinent business records relating to firearms transactions, must be maintained at the licensee's business premises for inspection by ATF investigators. See 18 U.S.C. § 923(g) and (h). A licensee "shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in ... the State in which the licensee's place of business or activity is located[.]" 27 C.F.R. § 478.99(a).
In 1969, ATF issued Revenue Ruling 69-59, which addressed the conduct of licensees at gun shows.[4] Revenue Ruling 69-59 clarified that a licensee "may engage in the business covered by the license only at the specific business premises for which his license has been obtained," thus he "may not sell firearms or ammunition at a gun show held on premises other than those covered by his license." Rev. Rul. 69-59, 1969-1 C.B. 360. Such a licensee may have a display booth or table at an off-premises gun show, "provided that the sale and delivery of the firearms or ammunition are to be lawfully effected from his licensed business premises only and his records properly reflect such transactions." Id. In 1986, the GCA was amended to allow a licensee to temporarily conduct business at a gun show located in the same state as specified on his license. See 18 U.S.C. § 923(j).[5] Such in-state gun shows are "considered part of the licensed premises" of the licensee, and thus do not require a separate license. 27 C.F.R. §§ 478.50(c), 478.100.[6]
*707 The Federal Firearms Regulations Reference Guide is an ATF publication "designed to help [licensees] comply with all of the laws and regulations governing the manufacture, importation, and distribution of firearms and ammunition." Reference Guide, ATF Pub. 5300.4 at 1 (2005). In addition to the statutes and regulations pertinent to federal firearms licensees, the Reference Guide contains "rulings, general information, and questions and answers to give [licensees] further guidance on the Federal firearms laws." Id. Section IV.C. of the Reference Guide, titled "Questions and Answers," contains FAQ F13. According to the United States, FAQ F13 has remained textually the same since 2000, and substantively the same since 1988, after 18 U.S.C. § 923(j) was enacted. (Mot. to Dismiss Memo. 7.)[7]

B. The Transaction at Issue

Plaintiff G & Z, a Virginia licensee, asserts it has "refrained from receiving firearms" at Virginia gun shows from plaintiff Privott. (Compl. ¶ 11.) Plaintiff Privott, a North Carolina licensee, claims he has refrained from transferring firearms to plaintiff G & Z at Virginia gun shows for subsequent transfer to non-licensed Virginia residents. (Id. ¶ 12.) Privott wishes to make an on-the-spot transfer of firearms to G & Z, which would then transfer the firearms to a non-licensed Virginia resident. It is this transactionthe transfer of firearms by out-of-state licensee Privott to in-state licensee G & Z at a Virginia gun show for subsequent transfer to non-licensed Virginia residentsthat plaintiffs claim they "have the right" to engage in, and which is prohibited by FAQ F13.[8] (Id. ¶ 18.) Plaintiffs claim that this transaction is permitted under the plain language of the GCA and that, therefore, ATF's interpretation, as set forth in FAQ F13, is erroneous.

C. Procedural History

Pursuant to Federal Rule of Civil Procedure 12(b)(1), defendant has moved to dismiss the action on two separate grounds: (1) FAQ F13 does not constitute reviewable final agency action under the Administrative Procedure Act; and (2) plaintiffs have not shown that they suffer from the requisite injury-in-fact necessary to establish standing under Article III of the United States Constitution. Alternatively, defendant submits that, because there is no genuine dispute of material fact, he is entitled to summary judgment pursuant to Federal Rule of Civil Procedure 56. On December 19, 2008, plaintiffs filed a response in opposition to defendant's motion,[9] and on December 30, 2008, defendant replied. The matter is now ripe for review.

II. Analysis
A motion under Rule 12(b)(1) may attack subject-matter jurisdiction in two critically different ways. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir.1982). The attack to jurisdiction may be based upon a facial *708 deficiency in the pleadings, or on facts that exist separately from the pleadings. In both situations, the burden of establishing jurisdiction rests with the plaintiff as the party asserting jurisdiction. Id. The moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Trentacosta v. Frontier Pac. Aircraft Indus., 813 F.2d 1553, 1558 (9th Cir.1987) (internal quotation omitted).

A. Jurisdiction

Plaintiffs assert jurisdiction based on 28 U.S.C. § 1331, which provides federal jurisdiction for actions arising under federal law. Because this action is brought against a federal official acting in his official capacity, however, defendant alleges that the claim is against the United States, thus sovereign immunity applies. Defendant argues that because neither 28 U.S.C. § 1331, nor the Declaratory Judgment Act, 28 U.S.C. § 2201(a), constitute waivers of sovereign immunity, plaintiffs' claim is cognizable, if at all, under the Administrative Procedure Act, 5 U.S.C. § 701, et seq. ("APA").
Even if a suit does not name the United States as a party, a claim is in fact against the sovereign if the effect of the judgment would be to restrain the government from acting or to compel it to act. See Ocean Breeze Festival Park, Inc. v. Reich, 853 F.Supp. 906, 917 (E.D.Va.1994). A suit against the United States is barred by sovereign immunity, unless plaintiffs can point to a specific and explicit waiver of such immunity. As defendants correctly point out "the Declaratory Judgment Act is not a waiver of sovereign immunity." Id. Similarly, 28 U.S.C. § 1331, the general federal question statute, serves "merely [as] a jurisdictional grant that in no way affects the sovereign immunity of the United States." Id. (quoting Radin v. United States, 699 F.2d 681, 685 n. 9 (4th Cir. 1983)).
In this case, defendant is an officer of the United States and is being sued in his official capacity.[10] Although the United States is not named in the action, a judgment in plaintiffs' favor would operate against the government by prohibiting it from prosecuting certain actions as violations of the GCA. Sovereign immunity, therefore, bars this action absent a specific and explicit waiver by Congress.[11]
The APA waives sovereign immunity for suits by persons claiming "legal wrong" or who have been "adversely affected or aggrieved" as a result of agency action. 5 U.S.C. § 702. Because plaintiffs challenge an ATF action, the APA provides the proper mechanism by which this court has jurisdiction.

B. Final Agency Action

As outlined above, defendant asserts two grounds for dismissal of plaintiffs' claim under Rule 12(b)(1). First, he alleges that FAQ F13 is not reviewable "final agency action" under the APA, thus sovereign *709 immunity has not been waived.[12] Additionally, he argues that plaintiffs have not suffered the requisite injury-in-fact to establish standing. Because the court concludes that FAQ F13 does not constitute reviewable final agency action, and, therefore, that it lacks subject-matter jurisdiction to hear plaintiffs' claims, it is unnecessary to address the standing issue.
"[T]he Administrative Procedure Act does not provide judicial review for everything done by an administrative agency," and ATF's Federal Firearms Regulations Reference Guide is not agency action of the type that is reviewable in court under the APA. Invention Submission Corp. v. Rogan, 357 F.3d 452, 459 (4th Cir.2004) (quoting Hearst Radio v. F.C.C., 167 F.2d 225, 227 (D.C.Cir.1948)).[13] "Other than agency action made specifically reviewable by statute, § 704 limits the APA's non-statutory right of judicial review to final agency action." Flue-Cured Tobacco Coop. Stabilization Corp. v. E.P.A., 313 F.3d 852, 857 (4th Cir.2002); see also 5 U.S.C. § 704 (recognizing judicial review for "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court ..."). A suit challenging final agency action pursuant to § 704 must be commenced within six years after the right of action first accrues, unless another statute prescribes otherwise. 28 U.S.C. § 2401(a); see also Harris v. F.A.A., 353 F.3d 1006, 1009 (D.C.Cir.2004). The right of action first accrues on the date of the final agency action. Id. at 1010.
In order to determine when agency action is "final," the United States Supreme Court has articulated a two-step inquiry:
First, the action must mark the "consummation" of the agency's decision making processit must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."
Bennett v. Spear, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal citations omitted). If a plaintiff is *710 unable to demonstrate that an agency action satisfies these two prongs, the action is not reviewable and must be dismissed for lack of subject-matter jurisdiction. Flue-Cured Tobacco, 313 F.3d at 857. Defendant argues that FAQ F13 does not satisfy either prong of the Bennett test.

1. Consummation of ATF's Decision-Making Process

Defendants allege that, rather than being the "consummation" of any decision-making process, FAQ F13 only "restates an almost four-decades old agency interpretation of the GCA first articulated in Revenue Ruling 69-59 in 1969." (Mot. to Dismiss Memo. 8.) Because FAQ F13 merely reiterates ATF's long-held position, it does not mark the completion of any decision-making process. Plaintiffs argue that FAQ F13 "sets forth the agency's definitive position on the interpretation and application of the federal statutes it enforces," and assert that defendant's contention that FAQ F13 is a restatement of ATF's long-held interpretation "only emphasizes that it is the `consummation' of the agency's decision-making process." (Opp'n Memo. 6.)
The "core question" when deciding whether a particular agency action is final is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). "In determining the finality of agency action a court should consider the practical effect of the agency's determination." Chamblee v. Espy, 100 F.3d 15, 17 (4th Cir.1996) (internal quotation omitted). "[A]gency action that merely reiterates or affirms an earlier agency decision and does not affect the rights or alter the status quo of the complaining party is not considered a `final agency action'[.]" Harris v. F.A.A., 215 F.Supp.2d 209, 213 (D.D.C. 2002). "Just as it would be folly to allow parties to challenge a regulation anew each year upon the annual re-publication of the Code of Federal Regulations, so too it is silly to permit parties to challenge an established regulatory interpretation each time it is repeated." Indep. Equip. Dealers Ass'n v. E.P.A., 372 F.3d 420, 428 (D.C.Cir.2004) (concluding that an EPA letter was not reviewable agency action when it merely restated "for the umteenth time" the agency's longstanding interpretation of certain regulations).
As plaintiffs recognize, FAQ F13 is an established, long-standing interpretation of the GCA.[14] While ATF has completed its decision-making process with respect to the application of the GCA to the transaction at issue, FAQ F13 does not represent the culmination of that process. The practical effect of FAQ F13 was not to alter the legal regime under which plaintiffs operated, nor to affect plaintiffs' rights, but rather to restate a long-held view. In light of the foregoing, the court concludes that FAQ F13 does not satisfy the first requirement of the Bennett test.

2. Legal Consequences of FAQ F13

"Agency action which carries no `direct and appreciable legal consequences' is not reviewable under the APA." Flue-Cured Tobacco, 313 F.3d at 859 (citing Bennett, 520 U.S. at 178, 117 S.Ct. 1154). With respect to this second prong of the Bennett analysis, defendant *711 argues that because FAQ F13 "neither compels action by licensees nor dictates outcomes for failure to comply," but merely restates ATF's long-standing position, it does not establish plaintiffs' rights or obligations and, therefore, does not constitute a final agency action. (Mot. to Dismiss Memo. 10.)
Plaintiffs contend that FAQ F13 represents ATF's "definitive position on the interpretation of the federal criminal statutes it enforces and sets forth the consequences of acting contrary to that interpretation." (Opp'n Memo. 7.) This fact, coupled with ATF's authority to initiate criminal prosecution for violations of the GCA, leads plaintiffs to conclude that FAQ F13 dictates outcomes for failure to comply with its directives. (Id. at 8.) Additionally, plaintiffs characterize FAQ F13 as establishing "beyond any doubt," that out-of-state licensees who transfer firearms to in-state licensees at gun shows for transfer to non-licensees "are currently subject to severe sanction."[15] (Id.) Thus, they claim the second prong of the Bennett test is satisfied.
In order for an agency action to be deemed final, "the agency must have made up its mind, and its decision must have inflicted an actual, concrete injury upon the party seeking judicial review." Am. Tel. & Tel. Co. v. E.E.O.C., 270 F.3d 973, 975 (D.C.Cir.2001) (internal quotation omitted) (further noting that such an injury "typically is not caused when an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party."). In this case, the existence of FAQ F13 does not harm plaintiffsshould they engage in the transaction described in FAQ F13, ATF must decide to prosecute them, and a court must agree with the agency that the transaction is prohibited by the GCA. In sum, ATF has not inflicted any injury on plaintiffs "merely by expressing its view of the law," Id. at 976, and the publication of FAQ F13 "does not of itself adversely affect [plaintiffs] but only affects [their] rights adversely on the contingency of future administrative action." Rochester Tel. Corp. v. United States, 307 U.S. 125, 130, 59 S.Ct. 754, 83 L.Ed. 1147 (1939).
Additionally, as defendant points out, no legal consequences flow from a "violation" of FAQ F13, but rather from the GCA and its implementing regulations. FAQ F13 does not change the ATF's position on the meaning of certain provisions of the GCA, but rather reiterates their long-held interpretation of the law. See Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C.Cir.2005) (explaining that, "if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review"); Indep. Equip. Dealers, 372 F.3d at 427 (the agency action at issue, a letter from the EPA explaining its position on certain emissions regulations as applied to plaintiff, was not final agency action because it had no "concrete impact" on plaintiff and merely restated EPA's "longstanding interpretation" of the regulations). As with the EPA Letter in Indep. Equip. Dealers, FAQ F13 neither announced a new interpretation of the law and regulations, nor effected a change in the law or regulations themselves. Id. It "was purely informational in nature; it *712 imposed no obligations and denied no relief." Id. In short, FAQ F13 has no "direct and appreciable legal consequences" for plaintiffs, nor does it "alter the legal regime" to which they are subject. Bennett, 520 U.S. at 178, 117 S.Ct. 1154.

III. Conclusion
For the above-stated reasons, defendant's motion to dismiss is GRANTED, pursuant to Rule 12(b)(1), because the subject of plaintiffs challenge, FAQ F13, does not constitute reviewable final agency action. The court, therefore, lacks subjectmatter jurisdiction over the case and plaintiffs' complaint is DISMISSED.
The Clerk is DIRECTED to send a copy of this Opinion and Final Order to counsel for both parties.
IT IS SO ORDERED.
NOTES
[1] The Gun Control Act of 1968 is located at 18 U.S.C. § 921, et seq.
[2] The Federal Firearms Regulations Reference Guide is published by the Office of Enforcement Programs and Services, Firearms Programs Division, within ATF. It was last revised in September, 2005.
[3] Plaintiffs dispute that a license is limited to the address specified therein, citing 18 U.S.C. § 923(c) and (j). (Opp'n Memo. 1.) As this language is taken directly from the Code of Federal Regulations, however, it stands for itself. See 27 C.F.R. § 478.50 ("The license covers the class of business or the activity specified in the license at the address specified therein. A separate license must be obtained for each location at which a firearms or ammunition business or activity requiring a license ... is conducted except" in certain, specified situations). Notably, plaintiffs do not challenge the GCA's implementing regulations in this case, limiting their claim to FAQ F13.
[4] Revenue rulings are official interpretations by the Internal Revenue Service of the proper application of the law to a specific transaction. Until July 1, 1972, when it became a separate bureau within the Treasury Department, ATF was a division within the Internal Revenue Service. A revenue (or ATF) ruling is an official interpretation by ATF that represents "the conclusions of [ATF] on the application of the law to the entire state of facts involved." 27 C.F.R. § 70.701(d)(2)(i)(A).
[5] The relevant portion of 18 U.S.C. § 923(j) provides that a licensee may "conduct business temporarily at a location other than the location specified on the license if such temporary location is the location for a gun show... and such location is in the State which is specified on the license."
[6] Title 27 C.F.R. § 478.100 more fully provides that "[a] licensee may conduct business temporarily at a gun show or event ... if the gun show or event is located in the same State specified on the license[.]"
[7] Plaintiffs do not address Revenue Ruling 69-59, nor the assertion that FAQ F13 has been substantively consistent since 1988, in their response to the motion to dismiss.
[8] Under FAQ F13, the "sales of firearms and simultaneous deliveries at the gun show" by an out-of-state licensee would "violate the law because the dealer would be unlawfully engaging in business at an unlicensed location."
[9] Plaintiffs' initial opposition was filed subject to defect, as it did not contain the proper nine-element signature block required on the certificate of service in electronic filings. This court granted plaintiffs' Motion for Leave to File a Corrected Opposition on December 23, 2008. Plaintiffs' correct opposition, filed on January 5, 2009, is identical in substance to the December 19, 2008, opposition, but includes a proper signature block.
[10] Indeed, plaintiffs have specifically alleged that defendant is charged "with responsibility to enforce the federal firearms laws in Virginia." (Compl. ¶ 6.)
[11] Plaintiffs attempt to sidestep sovereign immunity issues by arguing that their claim stems from defendant "acting beyond his statutory authority in enforcing the GCA as set forth in FAQ F13[.]" (Opp'n Memo. 11.) As plaintiffs acknowledge, their claims directly stem from defendant's enforcement of federal firearms laws. Defendant's actions are not ultra vires his authority and, therefore, may not be made the object of specific relief and are barred by sovereign immunity.
[12] Plaintiffs' opposition to defendant's motion refers to FAQ F13 and the "Nelson Letter," as the agency actions that give rise to their challenge. (Opp'n Memo. 3-10.) The "Nelson Letter" is a September 24, 2004, letter from Walfred A. Nelson, Deputy Assistant Director at ATF, to a party whose identifying information has been redacted. Def.'s Ex. 2, Attach. 5. The letter addresses the propriety of a proposed practice between in- and out-ofstate licensees at gun shows, and makes recommendations about how to conform the proposed practice to the requirements of the GCA and ATF regulations. Additionally, the letter explains the difference between "advance consignment" of firearms and off-premises dealing. It is this explanation that, plaintiffs assert, "sets forth the agency's interpretation of the law," and is a final agency action. (Opp'n Memo. 3 n. 1.) As the plaintiffs' complaint centered solely on FAQ F13, without mention of the "Nelson Letter," the court will refer only to FAQ F13 in its discussion.
[13] "Agency action" is defined by the APA as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Plaintiffs argue that FAQ F13 is a "rule" within the APA's definition of "agency action." (Opp'n Memo. 4.) A "rule" is "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Defendant asserts that, because FAQ F13 is merely a restatement of ATF's long-held interpretation of the GCA, it does not implement or interpret law, and does not meet the statutory definition of "agency action." Because the court finds the issue of finality dispositive on the question of jurisdiction, there is no need to decide whether FAQ F13 constitutes a "rule" as defined by the APA.
[14] Indeed, plaintiffs do not challenge defendant's assertion that FAQ F13 has remained substantively identical since 1988. Thus there is no dispute that, for at least two decades, ATF has interpreted the GCA to prohibit an out-of-state licensee to transfer a firearm to an in-state licensee at a gun show.
[15] Plaintiffs, agreeing that FAQ F13 represents "a settled position" of ATF, also assert that "ATF officials in the field are bound to apply" its mandates. (Opp'n Memo. 10.) The Federal Firearms Regulations Reference Guide, however, is a publication designed to provide guidance to licensees. While FAQ F13 does describe ATF's position on this particular transaction, ATF officials are bound to apply the GCA and its implementing regulations, not FAQ F13.