PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GOLDEN AND ZIMMERMAN, LLC;
ROBERT W. PRIVOTT,

       *Plaintiffs-Appellants,*

v.

EDGAR A. DOMENECH, Special
Agent in Charge Washington Field
Division Bureau of Alcohol,
Tobacco, Firearms & Explosives,

       *Defendant-Appellee.*

No. 09-1534

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca Beach Smith, District Judge.
(2:08-cv-00468-RBS-FBS)

Argued: January 29, 2010

Decided: March 18, 2010

Before TRAXLER, Chief Judge, NIEMEYER, Circuit
Judge, and Jackson L. KISER, Senior United States District
Judge for the Western District of Virginia,
sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Chief Judge Traxler and Senior Judge Kiser
joined.

## COUNSEL

**ARGUED**: Richard E. Gardiner, Fairfax, Virginia, for Appellants. Kent Pendleton Porter, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Dana J. Boente, United States Attorney, Alexandria, Virginia, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

Golden and Zimmerman, LLC, a Virginia licensee under the Gun Control Act, 18 U.S.C. § 921 *et seq.*, and Robert W. Privott, a North Carolina licensee under the Act, seek judicial review of the "Federal Firearms Regulations Reference Guide 2005," which is published by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to provide "information designed to help [licensees] comply with all of the laws and regulations governing the manufacture, importation, and distribution of firearms and ammunition." They seek a judgment declaring that "Frequently Asked Question (F13)" in the Reference Guide is inconsistent with the Gun Control Act. The answer given to Frequently Asked Question (F13) states, in effect, that Privott, as a North Carolina licensee, may not sell guns at a Virginia gun show to Golden & Zimmerman, a Virginia licensee, for transfer to Virginia residents. The district court dismissed the action for lack of subject matter jurisdiction, holding that publication of the Reference Guide was not "final agency action" subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

Because we conclude that the Reference Guide is simply informational and that its publication is neither "agency action" nor "*final* agency action," as necessary for judicial review under the APA, we affirm.

I

The Gun Control Act makes it unlawful for any person, except a licensed dealer, to engage in the business of selling firearms. *See* 18 U.S.C. § 922(a)(1)(A). Licensed dealers, in turn, are prohibited generally from selling firearms "to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located," except if the transaction is with another licensee. *Id.* § 922(b) & (b)(3). The Act sets out detailed rules governing the licensing process, *see id.* § 923, among which is the requirement that an applicant have "premises from which he conducts business subject to license," *id.* § 923(d)(1)(E). The Act also requires that a fee be paid for each "place in which the applicant is to do business." *Id.* § 923(a). And the Act's administration is dependent on the requirement that a licensed dealer have licensed business premises. *See, e.g.*, *id.* § 923(h) (requiring licensees to post their license "on the premises covered by the license"); *id.* § 923(g)(1)(A) (requiring licensees to maintain records at their business premises and authorizing law enforcement officers to obtain a warrant to inspect the records and firearms kept at a licensee's business premises during business hours). Regulations implementing the Gun Control Act similarly recognize the importance of a licensee's licensed premises. They provide that a license issued under the Act entitles the licensee "to engage in the business specified by the license, *at the location described on the license*, and for the period stated on the license." 27 C.F.R. § 478.41(b) (emphasis added); *see also id.* § 478.50 ("The license covers the class of business or the activity specified in the license at the address specified therein").

Although the Gun Control Act and its implementing regulations thus require generally that a licensed dealer sell guns only from the premises specified in its license, the Act also authorizes licensed dealers to "conduct business temporarily at a location other than the location specified on the license

if such temporary location is the location for a gun show . . . and such location is in the State which is specified on the license." 18 U.S.C. § 923(j). The implementing regulation explains that, for a gun show held in a licensee's State of business, "[t]he premises of the gun show . . . shall be considered part of the licensed premises," and, "[a]ccordingly, no separate fee or license is required for the gun show." 27 C.F.R. § 478.100.

For some 40 years, the ATF has published a Reference Guide for licensees, providing "information designed to help [the licensees] comply with all of the laws and regulations governing the manufacture, importation, and distribution of firearms and ammunition." The Reference Guide, of which there have been some 13 editions, contains the text of the relevant federal firearms laws, implementing regulations, rulings, and general information. The most recent edition, published in 2005, also contains a section listing approximately 250 frequently asked questions and answers.

In the questions and answers section, the Reference Guide has consistently explained to licensees that, based on statutes and regulations, a licensee is not authorized to transfer firearms at a gun show, even to other licensed dealers, unless the gun show is being held in the *same State* as the licensee's business premises. In the most recent iteration, this explanation is contained in Frequently Asked Question (F13) ("FAQ F13"), which states:

> **(F13) What may a licensed dealer do at an out-of-State gun show?**
>
> A licensed dealer may sell and deliver curio or relic firearms to another licensee at an out-of-State gun show. With respect to other firearms transactions, a licensed dealer may only display and take orders for firearms at an out-of-State gun show. In filling any orders for firearms, the dealer must return

the firearms to his or her licensed premises and deliver them from that location. Any firearm ordered by a nonlicensee must be delivered or shipped from the licensee's premises to a licensee in the purchaser's State of residence, and the purchaser must obtain the firearm from the licensee located in the purchaser's State. Except for sales of curio or relic firearms to other licensees, sales of firearms and simultaneous deliveries at the gun show, whether to other licensees or to nonlicensees, violate the law because the dealer would be unlawfully engaging in business at an unlicensed location.

[18 U.S.C. 922(a)(1), (b)(3), 923(a) and (j)].

While FAQ F13 is a summary of the relevant statutory provisions and regulations, it has its origins in Revenue Ruling 69-59 (1969), issued when the ATF was a division of the Internal Revenue Service. That ruling, published before the Gun Control Act was amended in 1986 to allow a licensed dealer to sell and deliver firearms *at a gun show held in the same State* as its licensed premises, stated that a licensee "may engage in the business covered by the license *only at the specific business premises for which his license has been obtained*" (emphasis added) and that, accordingly, "a licensee may not sell firearms . . . at a gun show held on premises other than those covered by his license." The ATF has published 13 editions of its Reference Guide containing the substance of Revenue Ruling 69-59. Moreover, FAQ F13 has remained textually identical since the 2000 edition of the Reference Guide and substantively identical since the 1988-89 edition, the first edition published after the Act's 1986 amendment.

Additionally, in a letter to a licensee dated September 24, 2004, the ATF Deputy Assistant Director, Walfred A. Nelson, took the same position expressed in FAQ F13. The Nelson letter cautioned that off-premises dealing violates 18 U.S.C.

§ 922(a)(1)(A) and that "[l]icensees who engage in such trans-
actions are subject to license revocation, forfeiture of the fire-
arms involved in the transaction, and criminal prosecution."
But it also advised that a licensee may lawfully transfer fire-
arms from its premises to a licensee with premises in the State
where the gun show is going to be held and then actually
deliver the firearms to the other licensee at the gun show. That
licensee could then sell the firearms to purchasers at the gun
show and transfer any unsold firearms back to the original
licensee at the end of the show.

## II

Golden and Zimmerman, LLC, obtained a federal license in
July 2008 that authorizes it to deal in firearms from its busi-
ness premises in Ivor, Virginia. Robert W. Privott obtained a
federal license in September 2008 that authorizes him to deal
in firearms from his business premises in Powells Point,
North Carolina. A few months after obtaining their licenses,
Golden & Zimmerman and Privott commenced this action
against the ATF for a judgment declaring that Privott, the
North Carolina licensee, can lawfully transfer firearms at gun
shows in Virginia to Golden & Zimmerman, the Virginia
licensee, for subsequent transfer at the shows to Virginia resi-
dents. In their complaint, Golden & Zimmerman and Privott
alleged that they attend gun shows in Virginia but that Privott
has refrained from selling firearms at the Virginia gun shows
and that Golden & Zimmerman has refrained from receiving
firearms at such gun shows from licensed dealers with busi-
ness premises outside of Virginia, such as Privott, because the
ATF has taken the position in FAQ F13 of the Reference
Guide that such conduct violates the Gun Control Act.

On the ATF's motion, the district court dismissed the com-
plaint, pursuant to Federal Rule of Civil Procedure 12(b)(1),
on the ground that the court lacked subject matter jurisdiction.
*Golden & Zimmerman, L.L.C. v. Domenech*, 599 F. Supp. 2d
702 (E.D. Va. 2009). It concluded that the ATF's Reference

Guide, including FAQ F13, does not constitute reviewable final agency action under the APA. Relying on the two-step inquiry articulated in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), for determining when agency action is "final" agency action, the district court reasoned that FAQ F13 is not final agency action because, "[w]hile ATF has completed its decision-making process with respect to the application of the [Gun Control Act] to the transaction at issue, FAQ F13 does not represent the culmination of that process." *Golden & Zimmerman*, 599 F. Supp. 2d at 710. The court also determined that FAQ F13 does not constitute final agency action because the Reference Guide's question and answer does not have any legal consequences: "FAQ F13 neither announced a new interpretation of the law and regulations, nor effected a change in the law or regulations themselves. It was purely informational in nature . . . ." *Id.* at 711 (internal quotation marks and citation omitted).

From the district court's order of dismissal dated February 27, 2009, Golden & Zimmerman and Privott filed this appeal.

## III

Golden & Zimmerman and Privott contend that the district court erred in concluding that FAQ F13 is not final agency action subject to judicial review under the APA.[1] They argue that FAQ F13 constitutes "agency action," which, as defined in 5 U.S.C. § 551(13), includes an agency "rule," which, in turn, is defined in § 551(4) as "an agency statement of general . . . applicability and future effect designed to implement [or] interpret . . . law." And they argue further that FAQ F13 is

---

[1]While Golden & Zimmerman and Privott contend that the Nelson letter also represents reviewable final agency action giving rise to subject matter jurisdiction, their complaint makes no mention of the Nelson letter. Inasmuch as counsel for Golden & Zimmerman and Privott conceded at oral argument that FAQ F13 articulates essentially the same position taken in the Nelson letter, we will address only whether FAQ F13 represents final agency action.

"*final* agency action" inasmuch as it represents "the 'consummation' of the agency's decision-making process because [it is] not 'of a merely tentative or interlocutory nature,' but set[s] forth the agency's definitive position on the interpretation and application of the federal criminal statutes it enforces." (Quoting *Bennett*, 520 U.S. at 178). They also contend, as required by *Bennett*, that FAQ F13 has legal consequences that directly affect them because it informs them and other licensees of the ATF's position that the transactions at issue are unlawful. Accordingly, they conclude that FAQ F13 is subject to judicial review.

The ATF contends that FAQ F13 is not agency action, let alone final agency action. Citing for support *Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004), the ATF argues that FAQ F13 does not meet the statutory definition of "agency action" by being a "rule," which must be "an agency statement . . . *designed to implement, interpret, or prescribe law* or policy." 5 U.S.C. § 551(4) (emphasis added). Rather, it claims that FAQ F13 merely restates the ATF's established interpretation and treads no new ground, pointing out that FAQ F13 "only reiterates, for the thirteenth time, ATF's view that the [Gun Control Act] does not permit [a licensee] to engage in the firearms transfers at issue here." The ATF also argues that FAQ F13 does not constitute *final* agency action, as defined in *Bennett*. It maintains that "an agency publication that only reiterates and restates a conclusion derived from a decisionmaking process long ago completed should [not] be deemed to 'mark the consummation of the agency's decisionmaking process.'" (Quoting *Bennett*, 520 U.S. at 178). In addition, it maintains, FAQ F13 fails to qualify as final agency action because it establishes no legal rights or obligations, but simply advises the regulated community of the law.

The parties thus agree that our jurisdiction depends on whether FAQ F13 is final agency action. *See* 5 U.S.C. § 704. And the answer to this question requires us to determine first

whether FAQ F13 is "agency action," as defined in 5 U.S.C. § 551(13), and second whether it is "final," as defined in *Bennett*.

The APA defines "agency action" as including "the whole or a part of an agency *rule*, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13) (emphasis added), and "rule" is in turn defined to include "an agency statement of general or particular applicability and future effect *designed to implement, interpret, or prescribe law* or policy," 5 U.S.C. § 551(4) (emphasis added). Thus, we first address whether FAQ F13 is designed to implement, interpret, or prescribe law.

The ATF's Reference Guide on its face purports to provide only "information" to help new licensees "comply" with the applicable laws and regulations. In reprinting the relevant statutes, regulations, and rulings, the Reference Guide undoubtedly did not "implement, interpret, or prescribe law." *See* 5 U.S.C. § 551(4). The Reference Guide also contains frequently asked questions and answers, which, it says, are intended "to give [licensees] further *guidance* on the Federal firearms laws." (Emphasis added). The questions and answers were not themselves designed to be enforceable rules, but rather to be a mechanism for explaining the laws, regulations, and rulings. They do not impose new legal requirements, having been reiterated over 13 times during the course of over 40 years. Rather, they attempt to restate or report what already exists in the relevant body of statutes, regulations, and rulings.

As then Judge John Roberts explained in *Independent Equipment Dealers*, a statement by an agency that simply *restates* an established interpretation "tread[s] no new ground" and "le[aves] the world just as it found it, and thus cannot be fairly described as implementing, interpreting, or prescribing law or policy." 372 F.3d at 428. Indeed, "[j]ust as it would be folly to allow parties to challenge a regulation anew each year upon the annual re-publication of the Code of

Federal Regulations, so too it is silly to permit parties to challenge an established regulatory interpretation each time it is repeated." *Id.* Holding that the publication of the Reference Guide constitutes agency action "would quickly muzzle any informal communications between agencies and their regulated communities—communications that are vital to the smooth operation of both government and business." *Id.*

Finding this reasoning of *Independent Equipment Dealers* persuasive, we likewise hold that the ATF's Reference Guide, including FAQ F13, is not "agency action," as defined in 5 U.S.C. §§ 551(13), 551(4).

In addition, we reject the argument that FAQ F13 is "*final* agency action." To be "final," two requirements must be satisfied: "First, the action must mark *the consummation of the agency's decisionmaking process* — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which *rights or obligations have been determined* or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (emphasis added) (internal quotation marks and citations omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties").

In this case, there was simply no decisionmaking process that culminated in the publication of the Reference Guide and FAQ F13. Even if FAQ F13 does anything other than simply restate the requirements of the Gun Control Act, any decisionmaking process that produced the ATF's interpretation about what a licensed dealer may lawfully do at an out-of-State gun show culminated some 40 years ago with the publication of Revenue Ruling 69-59 (1969). The 2005 Reference Guide merely restates for the thirteenth time the product of that prior decisionmaking, and it does so only to "provide[ ] information

designed to help [licensees] comply with all of the laws and regulations."

FAQ F13 also does not represent final agency action because it is not an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citation omitted). Golden & Zimmerman and Privott contend that FAQ F13 satisfies this prong of *Bennett*'s test because it informs the regulated community of the ATF's conclusion that it violates the law for a licensee to sell a firearm at an out-of-State gun show, even if the transfer is to a licensed dealer with business premises in the State where the gun show is being held. This argument, however, is made at too general a level. FAQ F13 might, indeed, inform the regulated community of what violates the law. But FAQ F13 does not itself *determine* the law or the consequences of not following it. Its role, as stated in the publication, is simply *to inform* licensees of what the law, previously enacted or adopted, is, and its publication did not itself alter the legal landscape. Indeed, if the ATF had never published the Reference Guide and FAQ F13, the ATF would still have had the authority to prosecute licensees for engaging in the conduct described in FAQ F13 because legal consequences do not emanate from FAQ F13 but from the Gun Control Act and its implementing regulations.

Golden & Zimmerman and Privott insist that the Supreme Court's decision in *Frozen Food Express v. United States*, 351 U.S. 40 (1956), is on "all-fours with the instant case" and therefore resolves this case in their favor. But a closer reading of that decision reveals that it is materially distinguishable. In *Frozen Food Express*, the Interstate Commerce Commission issued an order listing commodities that it found to be "agricultural commodities," the carriers of which were exempt from a permit requirement, and commodities it found not to be agricultural commodities. The Supreme Court held that this order was subject to judicial review because it had "an

immediate and practical impact on carriers who [were] trans-
porting the commodities" by "warn[ing] every carrier, who
[did] not have authority from the Commission to transport
those commodities, that it [did] so at the risk of incurring
criminal penalties." *Id.* at 44. While FAQ F13 also warns
members of the regulated community that they could be sub-
ject to prosecution for engaging in certain transactions, the
difference is that in *Frozen Food Express*, the order itself was
the source of the obligation, modifying the applicable legal
landscape by interpreting the scope of the agricultural com-
modities exception and becoming "the basis for carriers in
ordering and arranging their affairs." *Id.* FAQ F13, by con-
trast, is not the source of an obligation that gives rise to penal-
ties or other consequences.

Consequently, we hold that the ATF's publication of the
2005 edition of the Reference Guide and FAQ F13 did not
constitute final agency action reviewable in court, and,
accordingly, we affirm the district court's order dismissing
this case for lack of subject matter jurisdiction.[2]

*AFFIRMED*

---

[2]As an additional argument to support the district court's order, the ATF
contends that Golden & Zimmerman and Privott lack standing in that they
have neither suffered legal wrong nor been adversely affected or aggrieved
by the publication of FAQ F13. In response, Golden & Zimmerman and
Privott argue that in refraining from engaging in activity by reason of FAQ
F13, they were sufficiently harmed to satisfy the elements of standing.
Because we have concluded that the district court was correct in finding
that it did not have subject matter jurisdiction based on the absence of any
final agency action, we need not address the ATF's alternative argument.